We welcome you to the courthouse. I like it when the courthouse is full of people. I've had a terrific week this week, having Judge Rosenbaum with me on the panel. It's nice to have her help me try to figure these cases out. And the two of us together have enjoyed being with you, Judge Martinez. Judge Martinez, I'm sure you know, sits in South Florida. And when district judges come to help us, they don't get to put aside their regular work. They do this in addition. But it's been a real pleasure to have you and your law clerks here. We've enjoyed having you. Thank you very much. It's a pleasure to be here. So we have three cases this morning, and I see we have experienced counsel, so I'm not going to explain the stoplight system to you. And we'll just get underway with the United States of the Jenkins. Good morning. Good morning, and may it please the court. My name is Leanne Webster, and I represent Fred Jenkins in this appeal. This morning, I would like to address the mandate issue or whether the government should have been allowed to introduce additional evidence on remand, while Counsel for Willie Jenkins, Amy Weil, would like to address the loss calculation issue. This is a case about outcome-driven decision-making. At the first sentencing hearing on remand, the district court, Judge Evans, made a couple of comments that are reflective of the issues that we've presented in our appeal. She said, I think that justice just isn't served by saying the government should have done this the first time. I think the culpability of the defendants is so high that I cannot bring myself to cut off the evidence at this point, although I will freely admit that it is unusual for the government to bring in more evidence at a resentencing hearing. This is reflective of the issues that we've raised for a number of reasons. You know, you've hit on one of my pet peeves. I mean, I just feel like the rules ought to be the same. If when it goes back, if the government can raise new claims and present new evidence, then the defendant ought to be able to do that, too. And, you know, we've seen a lot of that in the sentencing context. But here, you know, I think we didn't give Judge Evans much guidance. So it's hard to fault her, I think. I think there are a couple of points that should have indicated to her that, or to the judge, that the government should not have been allowed to introduce additional evidence. Those points are two, I think. One is that the general rule established in Canty and Washington is where the sentencing objection is clear at the first sentencing hearing, where the objection was made to the PSI, to the enhancement, and when the government then had the opportunity to present evidence at the first sentencing hearing, then the government doesn't get a second bite at the apple. And that is the rule, again, that was established in Canty and Washington, and I think it's been applied in a number of recent unpublished decisions from this Court, including the Chee case and the Hamadula case that Judge Rosenbaum, I think you were on the panel for that. So I think that rule is clear. And so here, there's no question that the issue was sufficiently preserved in the first appeal at the first sentencing hearing. The government had the opportunity to present evidence, and, in fact, they did present evidence. And then this Court, in its decision, said that that evidence was insufficient. So if we apply the general rule, then that compels the conclusion that new evidence should not have been allowed on remand. The other point that I think responds to your question, Judge Martin, is that there was some indication from this Court what the outcome should be. And we can look to the post-decision litigation for that. So after the decision came down vacating their sentences, Willie Jenkins filed a motion to expedite the mandate that was based exclusively on the premise that the government would not be allowed to introduce new evidence on remand. And the Court granted that motion, and it was denied the government's motion in which they asked for, to be able to introduce additional evidence or for clarification either way. And so I think between the rule that was established in Canty and Washington and this Court's order, Judge Wilson's order that was issued in response to the motion to expedite the mandate, then there was guidance to Judge Evans, and she should not have allowed additional evidence. Did you want to maybe address, I guess, what we have said is the law of the circuit, that as a general matter, when a sentence is remanded on appeal, the sentencing process commences again de novo. We've said that in Grant and in Stinson. And so when we vacate a sentence and remand for resentencing, the Court's mandate vacates the entire sentence. So, I mean, do you see that as unrelated to this issue? Or how do you want to respond to that? I think that those cases aren't specific to this context. And so we have the more specific rules from, like I said, Washington and Canty, not to repeat those cases too much. And so while those general propositions exist, I think when you're deciding whether or not the government should have been allowed to introduce additional evidence, the more specific cases govern. And those are also the more recent cases from this Court on that issue. I wanted to just add, I know it's hard when you have counsel splitting time and issues, but I don't know whether it's you or Ms. Weill that's going to talk about the statement of the District Court about the political talk. We raised that issue, so I can talk about that. Okay. Well, you can do it on rebuttal, but I'm just interested in hearing your thoughts on that. And I can respond even though it's over time. Quickly. Quickly. Okay. She specifically said that she did not like the fact that Mr. Jenkins had made comments where he was demeaning the government. I think that sort of speech is clearly protected by the First Amendment and is not a permissible factor for a sentencing judge to consider. And so that rendered the sentence unreasonable under, I think, the Vasquez case. All right. Thank you. We'll hear from you again. Thank you. Good morning. Good morning. May it please the Court, my name is Amy Weill and I represent Willie Jenkins. The District Court in this case, Judge Evans clearly erred both in finding that there was a loss in this case, but also based on her failure to find jointly undertaken criminal activity and her reliance on the government's flawed extrapolation theory. First, with respect to jointly undertaken criminal activity, she seemed to think that because Fred and Willie Jenkins were owners of the business, that they were responsible for everything that was done within the business, whether they knew about it or not, by all of the employees of the business and the nine locations that they had for their business throughout Georgia and apparently also in Alabama. And she was saying the whole time that somehow the fact that they had committed fraud on 16 returns over a four-year period of time, that they were responsible for every return by every other tax preparer and that they had set some sort of guidelines. And she made this finding when she was making her findings as apparently to jointly undertaken criminal activity, although she never said that. The methods used by Fred and Willie were not idiosyncratic. When you look at what they were doing, there's a pattern, a pattern in practice there. There was no evidence that they had anything, any kind of pattern in practice with other employees. And I think the extravagance of the fraud and the pattern are good reasons to believe that the same type of fraud wasn't just confined to these returns. That's an impossible finding to make on this record. She goes on to say that they set certain guidelines. What guidelines? They set no guidelines. There was no discussion of any guidelines, no discussion of any contact between Fred and Willie and their other employees. She also said that you can look at it that they were the employers of the business and they did set standards for the business. What standards? There was no testimony about any standards. In other cases in which there has been a finding of loss throughout a business, there has been some type of testimony of fraud permeating the entire business and that other employees are involved. For example, in tax cases, you'll have a situation where there will be a person who's the owner of the business who will train, actually train the other employees. There will be evidence or testimony of the training of the other employees, guidance of them. I've had cases where they've had up on the walls, this is what you should put in the returns. This is the schools that you should put down. These are the number of kids you should put on fake stuff, teaching the other employees or other testimony that there was other guidance given to any other employees. Here, there was none. But what the court did, it agreed with the government's extrapolation theory since they didn't know about the 2,831 returns that had Schedule C. There were 16 returns proven at trial that had fraudulent Schedule C. The government wanted to extrapolate from the larger universe of 2,831 returns and said, well, essentially, she said, we're just going to assume they're all fraudulent and Fred and Willie are responsible for all of them. Even though, at the resentencing hearing, over our objection when the government put up evidence at the resentencing hearing, we were able to show that the majority of those returns were not, it was I think 58% of the returns, were not signed by either Fred or Willie. Willie never signed any returns. He's not a certified tax preparer. Fred signed some returns, but he didn't sign all these returns. Yet, the judge made a finding, I can find loss based on this entire universe of returns, even though there's only proof at trial of 16 returns being laid out into the entire universe and find fraud in all the returns. We argued, wait a second, you have to prove, the government has to prove jointly undertaking criminal activity. Government has to show something, some fraud connecting the defendants, either Fred or Willie, with the returns that were signed by other people. If not, you don't have enough factual evidence or a basis for that finding. Judges ignored that, and then she went into this, there were, they set guidelines, of which there was no proof. At trial, the government actually said, other employees weren't involved in this. I mean, that was the government's position. On the 16 returns, they said, no, you know, other employees weren't involved. This was totally Fred and Willie. At resentencing, there was no evidence of any other employer being involved in any kind of fraud on any return that had anything to do with Fred and Willie. So you can't connect it. You cannot find jointly undertaking criminal activity, which is a requirement. She also said at the time of sentencing that, well, I just don't feel good. I don't feel like I can go back and give them, you know, less of a sentence. I just don't feel good about that. They need, pretty much, they need a stiff sentence. But you can't just give them that. You have to make certain findings under the guidelines. And she was also making statements, well, that's just the M.O. She kept talking about this M.O. And the court, in its first opinion, said there was nothing in the trial evidence that was sufficient to support fraud between Fred and Willie in any return other than the 16 returns that were charged in the indictment. But she kept, Judge Evans, kept going back to that same argument. She, in fact, spent, I think it was around 45 minutes, I don't know, it's about 20 pages of the transcript, summarizing all of the trial testimony, which was the 16 tax returns. And then when she was through with it, she said, well, you know, they set the guidelines and they're responsible. Well, that was exactly what the first panel said isn't sufficient. I understand that the government went out and interviewed some people and had 34 people who they said had fraudulent returns. First of all, many of those have, don't have the fingerprints of Fred and Willie on them. There's nothing connecting Fred and Willie to any of those returns. Two of the returns that were counted in this group were, apparently, they, the government has this statement where we went out and interviewed Miss D. Davis and she said, I didn't have a business. And she said, I don't have, you know, I shouldn't have gotten these business expenses. She was dead. She had been dead for years. They didn't interview her, but that's their, they based all this on unreliable evidence. They also had Cursett Mullins, who they said they went out and interviewed. They never talked to him either. They talked to his father, who had nothing to do with his return. So we would ask the court, and I don't have time right this minute, I'll have to do it in my rebuttal, for an appeal bond, because Mr. Jenkins, Willie Jenkins, is still in jail. He's going to be in jail until August 2020. And he should have been way out, because either if limited on the returns or at least limited to the returns that were proven to have the fingerprints of Fred and Willie on them, he would have gotten at most 41 months. And the judge entered a low-ish guideline sentence. That's the top 41 months. So we ask the court when we come back. Thank you. Good morning. Good morning, Your Honors. You're kind of outnumbered over there, aren't you? I'm sorry, Your Honor? You're kind of outnumbered over there, aren't you? It's unusual for them to have more than us. I agree. Good morning, Your Honor. Alex Hyslop on behalf of the United States. May it please the court. First, the district court did not abuse its discretion in holding a de novo resentencing. And second, the loss amount here was not clearly erroneous. I'm going to start with the mandate or the scope of the remand first. Judge Martin and Judge Rosenbaum, I think you are correct. I think that the panel in Jenkins 1 did not give explicit instructions to Judge Evans as to how to conduct the resentencing. And under the default rule in, as Judge Rosenbaum highlighted, in Martinez and Stinson, when this court vacates a criminal sentence, it's gone. The record is clear and the district court has the authority to hold a plenary or de novo sentencing. Does that work both for the defendant and the government? It does work both ways. And in fact, I think this case is an illustration. Defendant can raise new claims. It can. And in Stinson, it addressed that issue. This rule comes out of Stinson. In Stinson, that was an appeal that addressed an appeal from a resentencing. And what happened at the resentencing. I'm going to quote you on that. And what happened at the resentencing, Your Honor, is that the district court ended up departing upward. The United States had not asked for an upward departure in the original sentencing. And on appeal, one of the arguments that the appellant raised in that case was, hey, the government didn't raise that argument below in the first sentencing. And therefore, it was improper for the government to be able to make that argument the second time around. Stinson said, no, when we vacate a sentence and we provide no instruction or direction, it's a general vacator and the district court can start anew. And to your point specifically, Judge Martin, in this case, there was a sophisticated means enhancement that the PSR had recommended. In the first sentencing, the Jenkins objected to it and the district court agreed with their objection and did not apply the sophisticated means enhancement. But you could have imagined a situation since they proceeded pro se at the first sentencing in which they had not objected to the sophisticated means enhancement. And then when represented by counsel on remand, counsel could have objected to the sophisticated means enhancement and the district court could have said, you're right, it does not apply. So the rule applies both ways. It's not a rule that's asymmetric and only favors the government. Can I get you to turn to Ms. Weil's argument about there was no proof of jointly undertaken criminal activity with regard to this large number of returns? The loss amount issue, Your Honor? Yes. Yes. I think the starting point, if I could start with the standard, it's subject to a clearly erroneous review. And the judge needed only to come up with a court, as it held in Whitman, must affirm the finding of the district court with respect to loss as long as it is plausible in light of the record. And so I think it would be— Did the government take inconsistent positions at trial and sentencing? I don't think so, Your Honor. I think— I mean, just more to the point, at trial, it was the government's position that Correct. So the issue— Okay. And then at sentencing, it was, well, their fingerprints are on these, you know, dozens, hundreds of tax returns. So you took a different position at sentencing. Well, I think, Your Honor, it's sort of to look at what was the scope of issue at trial versus sentencing. And I think the position at trial was in response to the specific defense that was raised at trial, which is, hey, Jerry, look, there are other tax preparer names on the returns. And at trial, we said, no, that's not a defense because you've heard from the actual taxpayers. And the taxpayers have indicated that the only individuals that you interacted with were Willie and Fred Jenkins. The government never took the position that there were no other taxpayers, that the Jenkins brothers were only involved in the 16 specific returns. And I think, Your Honor, if I could have a moment, I think it might help to walk through how the government got to its loss calculation in the sentencing to show that every assumption inured to the benefit of the appellants on remand. And the government's assumption was conservative. So counsel was correct. The total universe of returns was 5,000 returns. The government presented a specific theory of fraud at trial. The theory of fraud was that the schedule Cs, the Jenkins brothers were creating fraudulent schedule Cs in order to create a loss, which would then offset the person's income and generate a fraudulent refund. And so what the government did is, instead of looking at all 5,000 returns, it only looked at the subset of returns that had schedule Cs. That was approximately 2,800. It then took a sample of those 2,800, and that sample was 283 returns. And the way the government did that is they put all the returns in an Excel spreadsheet, and they took every tenth return. And the appellant's own expert at the resentencing said that was a correct way to create a random sample. Then what the government did is said, look, our theory of the case is you were generating fraudulent losses in order to offset the income. So we'll look at the sample of 283 returns, and if there are any returns that have a positive income, we'll just assume that those are not fraudulent. We're not saying that they were actually accurate. We'll just assume they were not fraudulent. So we take out 55 more returns, and that left us with 228 returns. And then what the government did in response to Jenkins 1, the issue in Jenkins 1 was not, did Willie and Fred, were they responsible for the filing of the returns? The issue in Jenkins 1 was whether or not the government's evidence with respect to advertising expenses and real estate costs and the fact that there wasn't depreciation was sufficient indicia of fraud to show that these sample returns were fraudulent. And the court said no. And so what the government did on remand is it went out and said, okay, we will go talk to as many taxpayers as possible. What about the argument that, you know, you can't, you couldn't have talked to Missy Davis, for example, because she wasn't with us on this earth, and then, you know, talking to the father instead of the taxpayer in another instance? Your Honor, I think that was addressed at resentencing because even the defendant's own interviewers or law enforcement witnesses that had sent out confirmed that those returns were, in fact, fraudulent returns. What was the evidence that the Jenkins brothers participated in the preparation of the tax returns out of Alabama? You know, Your Honor, I have to be honest. That's the first time I'd heard about Alabama was this morning. I don't recall any testimony about Alabama. I mean, did they have a business? I just don't recall it from the resentencing transcript. Did they have a business in, I mean, was one of the offices in Alabama? There were multiple locations. I will be honest, Your Honor, I can simply not recall testimony as to Alabama. I'm not suggesting counsel misstated. I just can't recall it from the record. Where were the offices? They were in the greater Atlanta area. And, in fact, the taxpayers, in fact, would meet Willie and Freddie not just at a single office, but they would see them at different offices. So it wasn't as if Fred and Willie were at a single office. Your Honor, if I could just quickly... I know you don't want me to ask questions, do you? But it helps us to know the answer to these questions. Your Honor, I'm not trying to move away from your question. And so just to the conservative nature of the calculation is they went out and interviewed 108 people. And of those 108 people... Just to let you know, and I mean, I don't mean to interrupt, and maybe my colleagues want to hear this. I'm very familiar with how they did it. Oh, okay. I think we all are. You are, all right. Okay. Well, I felt like it took over an enormous amount of the resentencing and Judge Evans expressed some confusion at times. I think that the briefing and the record do a very good job of explaining how it was reached. Okay. So, Your Honor, then in that respect, the evidence, the defendant, the appellants have raised three issues. One was the sufficiency tying the returns to Fred and Willie. The second is whether or not the extrapolation was unreliable. And the third was whether the interview process was unreliable. And the district... I'll start with the last one. Well, what about... I'd love to hear your thoughts on the statement made during sentencing about the political speech of the defendants. Oh, certainly, Your Honor. I think with respect to the political, the comment about their political views, as we explained in our briefing, I think it was tied more... The judge's comment there was tied more to sort of they were acting fraudulently. They didn't have respect for the government. They didn't show... Was it a sovereign citizen type of position? It was a sovereign citizen type position. And it was... The resentencing transcript spans, I think, almost 400 pages. It's a comment all the way at the end. It doesn't suggest that... Right before she imposed a sentence. Well, I mean, it is at the end. It is before she imposed a sentence. But it looks like what's driving the Judge Evans' sentence here is that these guys, in her view, based on the trial evidence and the evidence presented at sentencing, had run a fraudulent tax business through and through. But you agree with me. You can't punish somebody for... Even somebody who's committed a crime for political speech. No doubt. The government would never defend a judge. The government would never take the position that a defendant should be punished more harshly because of their political speech. I don't think that's what's happening here. I think it was reflective of them being sovereign citizens, not respecting the government. I'm sorry, Your Honor? I was also troubled by the discussion, but I understood it in a broader context as going to motive. Is that what you were... That's my understanding. That's what we argued in the brief, is that this is reflective of... They're running a fraudulent scheme. They don't really respect the IRS. They don't respect the tax laws. I mean, it is common in cases involving sovereign citizens that they try to inject their but that's in dish or evidence that they're committing fraud. And it's often used as evidence of their willfulness to file fraudulent tax returns. So I don't think that the judge was using it... But you would agree that, I mean, a judge has to be careful about making those kinds of comments because they could easily be construed as punishing somebody for political belief if they're not careful about how they make those comments. One hundred percent, Your Honor. But in this case, your position is that the comments went to the idea that they subscribe to the sovereign citizen movement. And so it was relevant to determining intent and motive. And the relative culpability. And then it was ongoing. And to the extent that there is any... It can look... It could be construed poorly. It can be construed as the court maybe starting to get across the line that it should not approach. That it wasn't a small comment. There was a lot of other factors driving the district court's sentencing rationale here. Namely, the type of fraud that was going on and what he believed was the extent of the fraud. Judge, one thing that I... Going back to the loss amount, if I may. Unless there's any other questions about the political issue. No. So the unreliable process. The district court had heard from the IRS agent who testified, described the process, described how agents went out and interviewed these taxpayers. Then the agent himself went back and called again. The agent... There are cases, in fact, cited by the appellants in their briefing in which this similar process was followed where an agent goes out and they need to figure out the loss. They interviewed taxpayers by phone. And then that agent testifies as to the fraudulent conduct. And one of their criticisms was they called them on the phone. But the appellant's own law enforcement experts called them on the phone as well. And that credibility determination is entitled deference on appeal. Now, one argument that the appellants raised in their reply brief is this extrapolation issue citing United States v. Jones. That's a red herring, Your Honors. What happened in Jones... What they're trying to argue here is because the government took out those 55 returns from the sample set of 283, somehow that ruins the sample. But that's different than what happened in Jones. What happened in Jones, it was a similar situation. The government... It was a health care fraud case. And the government looked at a sample set of patient returns. And they were only able to find parts of them. They took... All of the returns, all of the patient files that they were able to find were fraudulent. And the government said, okay, since 100 percent of that subset of the random sample were fraudulent, therefore we'll apply it across the entire universe and call 100 percent fraudulent. That's not what the government did here. The government only calculated the fraud rate of the returns only based on those returns in which there was actually... The taxpayer had confirmed there was fraud. And that was that subset of 39 returns. And so the problem presented in Jones isn't the problem presented here. And therefore, the government's extrapolation is fine. Finally, with respect to the sufficiency on Fred and Willie, I think that the... I see my time is only up. May I complete my sentence? Please. I think that it was clear there are cases in which the pattern of activity may be used to infer the conduct. And here, the pattern of activity was based on two main things. These guys were the owners of a small... This is a long sentence. I'm sorry. Small business. I apologize. And the nature of the fraud that was looked at, it was just the Schedule C fraud. For the foregoing reasons, the government respectfully asks that you affirm their sentences. Thank you. Thank you. I'm sorry. I wanted to give you a chance to respond because I had asked opposing counsel about... It seemed like, even though it might be close to the line, that it was a sovereign citizen type of thing and that the court was using it to explain motive, intent, and knowledge. And I think Judge Martin brings up a good point that we have to be careful about these things. And I wanted to give you an opportunity to respond and to let me know if you disagree that that's a fair interpretation of that. Respectfully, I do. We do disagree with that. I think that it's important to understand the she made these comments. And so there were two different categories of information. The first, which we think is the bigger problem, is that she was referring to when the Jenkins brothers would take the clients into their offices and talk to them. And she said, I also felt it was a very negative indication that the defendants discussed political stuff with their clients meant to demean the government. And I think that was referring to evidence that came out at trial that they were talking about, like the Illuminati and stuff like that. And that is political speech that's protected by the First Amendment. The stuff about the sovereign citizen did not come until much later. That came at the first sentencing hearing where they went pro se for the final sentencing hearing before the initial appeal. And at that hearing, they engaged in some limited, I would say, sovereign citizen rhetoric. And so those are two different things. And I think her comments at the final sentencing here, as Judge Martin indicated right before she imposed sentence, referred not just to the sovereign citizen stuff that was at the first sentencing hearing, but also to the fact that she disapproved of the fact that they were talking to their opinions on the government. And that is clearly protected under the First Amendment and cannot be a basis to increase their sentence here. Thank you. I appreciate that. Thank you. I just want to note one thing about the mandate issue. Specifically, you asked about Stinson and, I think, Burke earlier. And neither of those cases involved the question of whether or not the government could introduce new evidence. It was about whether a conviction that happened between the initial and the re-sentencing constituted a conviction. I see my time is up. Thank you. Thank you. With respect to the offices in Alabama, the government must have forgotten that in the Georgia area and in Alabama. So there were offices in Alabama. The prosecutor also responded to the question about jointly undertaking criminal activity by referring to the trial testimony that the Jenkins brothers created fraudulent Schedule C. That's our entire point. They created 16 fraudulent Schedule C. There's no evidence as to the creation of the universe outside of those 16 that they had anything to do with those Schedule C. And they also could not have had anything to do with 2,831 returns that were all over Atlanta and in Alabama. As for arguing, the government argued about the pattern of activity, there was no pattern of activity other than the 16 charged indictments. But even if there were, none of the pattern of activity related to any of the other employees and related to any of their tax returns. So the government continues to try to obfuscate that issue by going with, I guess, Judge Evans's M.O. M.O. of they made up a Schedule C on 16 returns. That doesn't get you 2,831 returns. We would ask the court to issue an appeal bond in this case that Mr. Willie Jenkins has spent 39 months in jail. The top of his guidelines would be 41. With the good time that he would have gotten while he was in jail, he should already be out if he had been sentenced only to the 16 returns, it would be 21 to 27 months in prison. If he had been sentenced only to the returns that were proven to have, as we said, his fingerprints on it or his brother's fingerprints, it would have been 27 to 33 months in jail or with you go with government's figure at the top of 41. And he should be out by now. And we would ask the court to not continue to hold him in jail, but to issue an appeal bond. Thank you, Ms. Weill. And I know that Ms. Weill is appointed under the Criminal Justice Act. And we appreciate your service to the court. He's kind of the go-to person. Were you, am I right about that or? Yes, Your Honor. Oh, I didn't know that. It's not on my notes. So we really appreciate it. And it's very, it's, the arguments have been very helpful to us. And we're, you know, proud of the work that you do for the system as we are of you. So thank you all for coming. Next case.